UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ADAMU TAYE CHAN,

           Petitioner,

    v.

RANDY GROUNDS,

           Respondent.

Case No.  11-cv-04413-WHO  (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Re: Dkt. No. 1

## INTRODUCTION

Petitioner Adamu Taye Chan was convicted in state court of forcible rape.  He seeks federal habeas relief on the grounds that the state court improperly determined that he did not present substantial evidence of his good faith and reasonable, albeit mistaken, belief in the victim's consent and, consequently, refused his request to instruct the jury on a reasonable-belief-in-consent defense.  For the reasons set forth below, the state court's determination was not contrary to, and did not involve an unreasonable application of, federal law, nor was it based on an unreasonable determination of the facts.  Chan's petition is DENIED.

## BACKGROUND

### I.  FACTUAL BACKGROUND

The following facts, presumed to be correct under 28 U.S.C. § 2254(e)(1), are excerpted from the Court of Appeal's decision, *People v. Chan*, Case No. A122550, 2010 WL 1227434, *1–

United States District Court
Northern District of California

5 (Cal. Ct. App. Mar. 30, 2010) ("*Chan*"). [1] *See, e.g., Brown v. Horell*, 644 F.3d 969, 972 (9th Cir. 2011) (excerpting Court of Appeal's presumptively correct statement of facts).

Y.D. [Yukari] came to the United States from Iwate, Japan in 2005 to study English at a language school in Berkeley, and returned to Japan in June 2006. She made the 20-hour trip from her home in Japan to testify at defendant's 2008 trial, where her testimony was introduced through interpreter Eri Minoura.

Y.D. testified that she met defendant on April 6, 2006, while walking in Berkeley. Y.D. pretended not to understand English because speaking English was difficult for her, but defendant addressed her in Japanese. They talked for about 15 minutes, she got defendant's business card, and gave him her e-mail address. Defendant e-mailed her, asked when they could meet again, and the following e-mails were exchanged. Y.D. wrote, "i enjoyed to meet you. but, i'm not interesting person. i think just stupid person. i hope we meet again!" Defendant wrote, "heard people from Iwate are very smart! let's have coffee and chat. let me know when you!" Y.D. wrote, "i have a lot of free time. but, I have to go temple every weekend. so, i think weekdays better. how about your schedule? see you!" Defendant wrote, "I am in LA right now, but I'll be back on Monday. Why don't we meet on tuesday [April 11, 2006]? Let me know when is good for you. I'll be free all day. Have a good weekend!" Y.D. testified that she had a boyfriend at the time and was not interested in defendant, but thought that he could help her learn English because he spoke Japanese.

Y.D. saw defendant again while walking in Berkeley on April 10, 2006. Defendant was in his car and offered her a ride. She testified at trial that she refused the offer, but told Berkeley Police Officer Jeff Shannon when he was investigating the case that she had accepted a ride home from defendant that day. [2] They arranged to meet the next day at a Berkeley BART station.

Defendant picked her up as planned on the afternoon of April 11, 2006, and drove her to a coffee shop where they talked for one or two hours. When they got back in defendant's car, Y.D. thought he was going to take her home, but he drove around Berkeley for awhile and took her to his house. They went inside and he showed her family photo albums. He tried to kiss her, she said "I don't want to," he apologized, and she said, "I'm going to go home now."

---

[1] Chan takes issue with this presumption, stating that "as is its common practice, the state appellate court wrote an incomplete statement of facts that supported its result." Traverse at 1. Chan points to various facts which he contends were omitted from the Court of Appeal's summary of the trial record, (Petition at 1-2), but he does not contend that the actual facts discussed by the Court of Appeal were incorrect. I have reviewed the facts which Chan claims were omitted and, where appropriate, noted them in the footnotes. They do not change the outcome of his petition.

[2] Yukari first testified at trial that she did not get a ride home from petitioner. RT 193. She later testified that she did not think she had gotten a ride home from him. RT 246.

United States District Court
Northern District of California

Defendant said that he would take her home, but wanted to show her around the house. When they got to his bedroom upstairs, she turned around to go downstairs, but he grabbed her by the shoulders and pulled her backward. She pushed him away, ran down the stairs, started crying, slipped, and slid part way down the stairs on her bottom. Defendant followed her and blocked her way out of the house.

She told him that she wanted to go home, but he locked the front door, and she testified that "[h]e looked out of the window, which is located on top of the door, and he was checking to see the outside, probably because I was crying really hard." Defendant then said, "Oh, I will take you home," and went to the kitchen to get a key to the door. She tried to leave, but he dashed back to her, wrapped his arm around her head, pushed her down to the floor, touched her in the crotch over her clothes, covered her mouth to muffle her crying, and said, "I'm going to hurt you. I'm going to hurt you."[3] When he said this, she thought he would kill her if she did not let him have sex with her.

Defendant pulled her by the hand to his bedroom. After he took off her top and his clothes, she took off her pants and underpants. Y.D. reported to Officer Shannon that defendant tried, but was unable, to take off her jeans, and she thought he was going to hit her so she took them off herself. When she was asked at trial why she removed her pants, she answered, "Well, since it has come this far, I thought no matter how hard I try to run away, I wouldn't be able to run away." Y.D. was next asked, "Had you already told the defendant at that point that you did not want to have sex with him?" She answered, "I had been crying a long time before that and I said I really don't want to do it and I said I want to go home, so I thought he knew it. Even though he may not have understood my-the language, normally if a crying woman, you would think a crying woman wouldn't want to do that. Right?"

Defendant took her to the bed and, while she wept, put his penis in her mouth, then put his fingers in her vagina, and then put his penis in her vagina. He took her by the hand to a bathroom, using force that was not "that strong, like normally one would pull someone's hand," where, as she continued to cry, he again put his penis

---

[3] The following footnote is quoted verbatim from the Court of Appeal's decision:

Y.D. testified that at some point during this sequence of events defendant said, "I'm sorry" and told her to stand up, but then pushed her down again. Y.D. stated in cross-examination that she could not remember the details of what happened when she ran to the front door trying to leave the house. "[I] came down the stairs," she said, "and he was standing right in front of me. And the next thing was the door.... I only remember pieces." In her statement to Officer Shannon, Y.D. said that after defendant blocked her way downstairs, she told him that she wanted to go home, screamed, "[d]on't touch me," and ran to the front door. When defendant stopped her there, she sat down, frightened and crying. Defendant pulled her off the floor, took a handkerchief from his pocket, and covered her mouth. She resisted, but he told her, "I will hurt you," and put her in a headlock.

in her vagina. He took her by the hand back to the bedroom, where, as she continued crying, he again put his penis in her vagina.

Y.D. testified that when defendant was finished, he wiped his penis with a Kleenex, and they got dressed. Y.D. said, "I'm going home," defendant offered her a ride, she declined the offer, and walked home. While she was walking she began calling her friend Masayo Sasaki.

Sasaki, assisted by interpreter Minoura, testified that when she checked her cell phone around 9:00 p.m. on April 11, 2006, after attending a temple service in Burlingame, she found that she had seven missed calls from Y.D. She called Y.D. and Y.D. told her that she had been raped by a man named Adam, with whom she did not have a romantic relationship. Sasaki and her husband went to Y.D.'s home, and took her to San Francisco General Hospital. Sasaki said that Y.D. was normally "a very cheerful person," but was frightened and crying that night.

Officer Shannon was dispatched to see Y.D. at San Francisco General Hospital, and she told him that she had been raped by Adam Chan. Shannon took Y.D. to Highland Hospital, where he obtained statements from Y.D. and Sasaki in the early morning hours of April 12, 2006.

Physician Assistant Jennifer Majarian conducted a SART (Sexual Assault Response Team) examination of Y.D. at Highland Hospital that morning. Y.D. told Majarian that her assailant had grabbed her by the arms, put his hand over her mouth, choked her with his arm around her neck, thrown her on the ground, and picked her up and thrown her over his shoulder. Y.D. said that the assailant had penetrated her with his penis and finger, and forced her to orally copulate him. She said that she did not know whether the assailant had ejaculated in her vagina, but knew that ejaculation had occurred "because he had her clean him up with a piece of tissue paper." Majarian found bruising on the inside of Y.D.'s left arm, consistent with having been grabbed there, and bruising and erythema (redness) of the cervix consistent with forced digital or penile penetration.

United States District Court
Northern District of California

4

United States District Court
Northern District of California

On cross-examination, Majarian stated that she found no injury or redness inside Y.D's vagina.[4] She indicted that cervical bruising was uncommon, but acknowledged that such bruising could be consistent with consensual sex. She conceded that, in her report of the examination, she wrote that Y.D. knew her assailant had ejaculated because "she cleaned him with tissue paper," not because "*he had* her clean him with a piece of tissue paper" (italics added) as she had testified.

Berkeley Police Officer Roselyn Jung testified that Y.D. came to the Berkeley Police Department on April 27, 2006, to view a photo lineup and make a recorded telephone call to defendant. Y.D. quickly picked out defendant's picture from the lineup, and placed a "pretext" call to defendant to try to elicit an admission of guilt.

The recorded conversation between Y.D. and defendant lasted about 25 minutes and was conducted in parts in Japanese. Y.D. had to hang up and call back at one point when defendant said that he could not hear her. The recording of the calls was played for the jury, and the Japanese portions were translated for the jury by interpreter Minoura. Defendant did not confess in the calls to raping Y.D.

During deliberations, the jury asked for the transcript of the recorded calls, and a read back of the translation of the following portion of the conversation (questions by Y.D., answers from defendant, italicized words spoken in Japanese):

"Q. *Why? Then what shall we do? What shall we do? Well, that was rape, wasn't it?*

"A. I don't think so.[5]

---

[4] Chan asserts that "[r]eporting those concessions on cross-examination hardly does full justice to the evidence concerning the SART exam."  Traverse at 1.  He contends that "[t]he record actually reveals that the assistant examined not only the inside of the vagina, but the external genitalia, perineum (area between vagina and anus) and inner thighs as well, and this exam revealed no signs of abrasion, laceration, bruising, redness, tenderness, or injury of any kind. (RT 156-61) As to the arm bruising, the assistant found "two linear mark patterns" on Yukari's left arm (RT 142), but she did not document whether they looked fresh and she could not recall at trial what they looked like at all (RT 143, 167). She took no photographs of the arm, but the attending police officer did. (RT 289) Presented with those photographs at trial, the assistant testified that she could not tell what they represented or whether, indeed, the circled areas were any different from the rest of the arm. (RT 168) Although the assistant testified that the two linear marks on one arm were consistent with the story told by Yukari of being grabbed by the arm (RT 143), Yukari had actually reported she had been grabbed by both arms (RT 141, 171), a story with which marks on one arm were far less consistent."  Traverse at 1-2.

[5] Chan notes that "the opinion omitted that, in response to Yukari's direct question, 'Did you rape me?' Chan answered unequivocally 'No.' (RT 67) Shortly thereafter, in response to the same question, he answered, 'I don't think so.' (RT 68) These answers were more than a failure to confess—they were affirmative denials."  Traverse at 2.

"Q. *Because I don't want to do it. I didn't want to do it. I was crying really.*

"A. Yeah.

"Q. *Then-hello? I'll tell you this. Normally-hello? If she's crying and if the girl is using a loud voice like that and says something like she wants to go home, having sex with her would be rape. I'm telling you it's rape. Hello?*

"A. *Hai* [a Japanese word the interpreter said could mean "yes," you're right," or "I'm listening"].

"Q. *Isn't it rape? Are you listening?*

"A. *I am.*

"Q. *So its rape.*

"A. What do you want from me? Huh?"

Officer Jung testified that Y.D. wept after making the pretext phone calls, and it appears from the record that she wept on the stand at trial when the recording of the calls was played.

(…)

Defense counsel argued in his opening statement and closing argument that defendant and Y.D. had consensual sex. In the opening statement, counsel said that Y.D. claimed otherwise because she wanted and expected a continued relationship with defendant; defendant did not, so Y.D. "felt used, probably felt shunned, probably felt scorned." In closing argument, counsel addressed Y.D .'s alleged motive for lying as follows: "Some things are simply unexplainable. It's easy for the prosecutor to come up and say why would she lie? Why would she lie? Some things are unexplainable. We might know if we could subject her to some psychological testing, but we're not allowed to. [¶] Could it be she felt guilty because she had a boyfriend and she had been flirting or courting Mr. Chan and she went over to his house and consensually had sex with him? She might. [¶] You may wonder why would she come here to court and lie again, two years later? Why wouldn't she just simply come clean now and tell the truth? I submit to you she's in too deep. She's perpetuated this lie for two years. She told a friend. She told the police. She told the nurse. She told the prosecutor. It's too late now for her to just come in and say, okay, I've been lying. She is in too deep."

The prosecutor responded in his final closing argument: "Today, the defense is saying that they don't know, that we don't know why the victim is making this up, but that's very different from the way that they started the case, telling you that the victim wanted a relationship and that she felt, quote, used, shunned, and scorned. But ... at this point, they couldn't argue that because there was absolutely no evidence of that. [¶] We know this because [Y.D .] had absolutely no communications with the defendant after April 11th of 2006.... [¶] ... [¶] She

doesn't have any contact with Adamu Chan until April 27th of 2006, when she makes the pretext phone call. And when she makes that pretext phone call, this is the first time that he's heard from her. And the accusations that she makes of rape, his responses are 'No, I don't think so.' He doesn't say, 'Well, you know, would you stop calling me because, you know, I don't want a relationship with you. It was a one-night stand. Stop calling me.' [¶] No. He knows this is the first time she's called and he also knows that he's been caught."

In his opening statement, defense counsel outlined defendant's life story, stating among other things that he had been accepted to law school at U.C. Berkeley's Boalt Hall, but had moved instead to Japan, where he taught English and produced and hosted television programs. Counsel said that "the evidence will show that there is absolutely nothing, nothing in the life, the style, the person, or the spirit of Adamu Chan that would have led him to do what he stands accused of today." However, defendant did not testify [the court ruled that, if defendant testified, he could be impeached with his 1995 robbery conviction], and the defense offered no evidence.

## II.    PROCEDURAL BACKGROUND

The trial judge declined Chan's request to instruct the jury with the *Mayberry* instruction, California Jury Instruction, Criminal No. 10.65, which provides that a reasonable though mistaken belief in consent is a defense to rape.  The jury found Chan guilty of one count of sexual penetration by a foreign object (CAL. PEN. CODE § 289(a)(1)); one count of forcible oral copulation (*id.* § 288a(c)(2)); three counts of forcible rape (*id.* § 261(a)(2)); and one count of false imprisonment by violence (*id.* § 236).  *Chan*, at *1.  He was sentenced to 23 years in state prison. *Id.*  Chan appealed his conviction and sentence, but the California Court of Appeal affirmed and the California Supreme Court denied his petition for review without comment.  Petition at 2.  This federal habeas petition followed.

Chan argues that the trial court's denial of his request to provide the *Mayberry* instruction to the jury violated his constitutional rights to due process and to present a complete defense.  He contends that this error was compounded by "the extraordinary advantages given the prosecution on the issue of actual consent, [and] only by considering the *Mayberry* defense of a reasonable belief in consent could a jury have possibly provided [Chan] with a fair and reasonable verdict."

1    Petition at 37.[6]

2    **III.    THE *MAYBERRY* INSTRUCTION**

3         *Mayberry* holds that if a defendant "entertains a reasonable and bona fide belief" that a

4    person voluntary consented to sexual intercourse, the defendant "does not possess the wrongful

5    intent that is a prerequisite . . . to a conviction of . . . rape by means of threat or force" under

6    California Penal Code section 261.  *People v. Mayberry*, 15 Cal. 3d 143, 155 (1975).  The

7    *Mayberry* instruction, as codified at California Jury Instruction, Criminal No. 10.65, states:

8              In the crime of unlawful [sexual activity], criminal intent must exist
               at the time of the commission of the (crime charged).  [¶]  There is
9              no criminal intent if the defendant had a reasonable and good faith
               belief that the other person voluntarily consented to engage in [the
10             sexual activity].  Therefore, a reasonable and good faith belief that
               there was voluntary consent is a defense to such a charge[,] . . .
11             unless the defendant thereafter became aware or reasonably should
               have been aware that the other person no longer consented to the
12             sexual activity.  [¶]  However, a belief that is based upon ambiguous
               conduct by an alleged victim that is the product of conduct by the
13             defendant that amounts to force, violence, duress, menace, or fear of
               immediate and unlawful bodily injury on the person of the alleged
14             victim or another is not a reasonable good faith belief.  [¶]  If after a
               consideration of all of the evidence you have a reasonable doubt that
15             the defendant had criminal intent at the time of the accused sexual
               activity, you must find him . . . not guilty of the crime.

16   *Chan*, *5 n.3 (citing CALJIC No. 10.65).

17        "The *Mayberry* defense has two components, one subjective, and one objective.  The

18   subjective component asks whether the defendant honestly and in good faith, albeit mistakenly,

19   believed that the victim consented to sexual intercourse.  In order to satisfy this component, a

20   defendant must adduce evidence of the victim's equivocal conduct on the basis of which he

21   erroneously believed there was consent."  *People v. Williams*, 4 Cal. 4th 354, 360-61 (1992)

22   (footnote omitted).  In addition, "the defendant must satisfy the objective component, which asks

23   whether the defendant's mistake regarding consent was reasonable under the circumstances.  Thus,

24

25   _____

26   [6] Chan also claims that he was prejudiced because lay witnesses were permitted to vouch for
     Yukari's credibility, an expert witness improperly testified about the general behavior of Japanese
27   rape victims, and Yukari's translator had a conflict of interest.  *Id.* at 37-43.  He "does not raise
     [these] rulings as independent grounds for federal relief[,]" but only to show that failure to issue
28   the *Mayberry* instruction "substantially and injuriously affected the jury's verdict."  *Id.* at 37.

United States District Court
Northern District of California

regardless of how strongly a defendant may subjectively believe a person has consented to sexual intercourse, that belief must be formed under circumstances society will tolerate as reasonable in order for the defendant to have adduced substantial evidence giving rise to a *Mayberry* instruction." *Id.* at 361 (internal quotation marks omitted).

The *Mayberry* instruction "should not be given absent substantial evidence of equivocal conduct that would have led a defendant to reasonably and in good faith believe consent existed where it did not." *People v. Martinez*, 47 Cal. 4th 911, 953-54 (2010) (quoting *Williams*, 4 Cal. 4th at 362). Where the prosecution and defense present "wholly divergent accounts [that] create no middle ground from which [the defendant] could argue he reasonably misinterpreted [the victim's] conduct," there is no substantial evidence of equivocal conduct warranting the *Mayberry* instruction. *Id.* at 363. Accordingly, if "defense evidence is unequivocal consent and the prosecution's evidence is of nonconsensual forcible sex, the *Mayberry* instruction should not be given." *Id* (citation omitted).

## LEGAL STANDARD

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the Court may entertain a petition "for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the" state court's "adjudication of the claim . . . (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d).

"Contrary to" and "unreasonable application of" in subsection (1) have different meanings. "A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [Supreme Court], or if it decides a case

1    differently than [the Supreme Court] ha[s] done on a set of materially indistinguishable facts."[7]

2    *Bell v. Cone*, 535 U.S. 685, 694 (2002).

3        A federal habeas court may grant relief under the "unreasonable application" clause if the

4    state court correctly identified the governing legal principle from Supreme Court decisions "but

5    unreasonably applies it to the facts of the particular case." *Id.* "[A] federal habeas court may not

6    issue the writ simply because that court concludes in its independent judgment that the relevant

7    state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that

8    application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000). "Even a

9    strong case for relief does not mean the state court's contrary conclusion was unreasonable."

10   *Harrington v. Richter*, 131 S. Ct. 780, 786 (2011). "[A]n *unreasonable* application of federal law

11   is different from an *incorrect* application of federal law." *Taylor*, 529 U.S. at 365 (emphasis in

12   original). A claim for habeas relief should be denied on the merits "so long as fairminded jurists

13   could disagree" on the correctness of the state court's decision." *Harrington*, 131 S. Ct. at 786

14   (citation omitted).

15       "The burden on the habeas petitioner is 'especially heavy' where, as here, the alleged error

16   involves the failure to give an instruction." *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006)

17   (citing *Henderson v. Kibbe,* 431 U.S. 145, 155 (1977).

18

19   _____

20   [7] Chan does not raise a claim for relief under the "contrary to" prong: he does not allege that the
     Court of Appeal arrived at a conclusion opposite to that reached by the Supreme Court on a

21   question of law, or that it decided the case differently than the Supreme Court has on a set of
     materially indistinguishable facts. *See, e.g., Bell*, 535 U.S. at 694.

22   Chan argues that the trial court applied the wrong *Mayberry* standard when it refused to provide

23   the *Mayberry* instruction on the grounds that Yukari did not testify that she consented to have sex
     with Chan. Petition at 21-22 ("When the issue was raised again in petitioner's motion for new

24   trial, the trial court for the third time justified its denying petitioner his defense by again looking to
     the alleged victim's testimony for an unequivocal assertion of her consent"). But the trial court's

25   reasoning is not before me. Rather, my task is to review the "last reasoned state-court decision."
     *Smith v. Lopez*, 731 F.3d 859, 871 (9th Cir. 2013); *see also Johnson*, 133 S. Ct. at 1094, n.1 (a

26   federal habeas court must examine "the last reasoned state-court decision" to address a petitioner's

27   claims). Because the California Supreme Court summarily denied Chan's petition for review, I
     "look through" the California Supreme Court's decision to the California Court of Appeal's

28   decision as the last reasoned state court-decision. *Smith*, 731 F.3d at 871.

United States District Court
Northern District of California

1    **DISCUSSION**

2        Chan argues that the Court of Appeal's decision involved an unreasonable application of

3    the evidence presented at trial to clearly established federal law.[8]  Petition at 23.  He contends that

4    the following evidence demonstrates his reasonable, but mistaken, belief in Yukari's consent:

5        (1)   after meeting petitioner in Berkeley, Yukari sent an e-mail
6              stating that she had enjoyed meeting him and hoped to meet
              him again;

7        (2)   after receiving a response to her first e-mail, Yukari sent
              another e-mail stating that she would rather meet him on a
8              weekday than a weekend;

9        (3)   petitioner gave Yukari a ride home on the day before the
              charged incident;

10       (4)   on the day of that incident, petitioner met Yukari at a cafe and
              afterwards drove her around to see the sights in Berkeley;

11       (5)   Yukari then went with petitioner to the house he shared with
12              his mother;

13       (6)   in the living room, they looked at his photographs together;

14       (7)   Yukari felt fear when petitioner touched her arms, but she did
              not say anything to him;

15       (8)   after petitioner tried to kiss her, but was rebuffed, Yukari went
              with him to look at the rooms in the house, including his
16              bedroom;

17       (9)   when the two later returned to his bedroom, Yukari removed
              her own pants and underpants;

18       (10)  after initially having sex with Yukari in the bedroom,
              petitioner led her without resistance to the bathroom, where
19              they continued to have sex, and again led her back to the
              bedroom without resistance to have sex again;

20

21    _____

22    [8] Respondent argues that Chan's habeas claim is barred by *Teague v. Lane*, 489 U. S. 288 (1989),
      because the Supreme Court has not recognized a federal constitutional duty to instruct on a
23    defense in a state criminal case.  Answer at 10.  *Teague* "prevents a federal court from granting
      habeas corpus relief to a state prisoner based on a rule announced after his conviction and sentence
24    became final."  *Caspari v. Bohlen*, 510 U.S. 383, 389 (1994).  But "it is a long-standing principle
      that instructional error may so infect a trial that the resulting conviction violates due process."
25    *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005) (rejecting argument that habeas claim
      alleging failure to give imperfect self-defense instruction in homicide case was barred by *Teague*)
26    (citing *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)); *see also Bradley v. Duncan*, 315 F.3d 1091,
27    1099 (9th Cir. 2002) ("the state court's failure to correctly instruct the jury on the defense may
      deprive the defendant of his due process right to present a defense").  I therefore proceed to the
28    merits of Chan's claim.

11

(11) after having sex with petitioner, Yukari wiped his penis with a tissue;

(12) Yukari testified at trial, through an interpreter, that, with respect to her communications with petitioner during the incident, "[I] said I really don't want to do it, I said I want to go home, so I thought he knew it. *Even though he may not have understood my-the language"* (emphasis added);

(13) petitioner offered her a ride home after their sexual activity, an action inconsistent with a realization on his part that said activity was against her will;

(14) according to the examination of the prosecution's medical expert, the condition of Yukari's vagina was consistent with consensual sexual activity;

(15) in a pretext call placed by Yukari to petitioner days after the alleged sexual assault, he twice denied that he had raped her; and

(16) the recording of the pretext call, played for the jury, established that Yukari and petitioner had difficulty understanding one another in *both* English and Japanese.

Petition at 8-9 (internal quotation marks omitted) (emphasis in petition).

The question under AEDPA is not whether the Court of Appeal's determination was incorrect that the evidence presented at trial did not entitle Chan to the *Mayberry* instruction.   The question is whether it was unreasonable.  *See, e.g., Bell*, 535 U.S. at 694.  While Chan strongly argues that there was sufficient evidence to merit the instruction, the Court of Appeal's determination to the contrary was not unreasonable.  The Court of Appeal considered the subjective and objective prongs of the *Mayberry* instruction in light of the evidence presented at trial and concluded that there was not substantial evidence of Chan's reasonable but mistaken belief that Yakuri consented.[9]  Because its determination was not based on an unreasonable application of federal law to the evidence, its decision did not violate Chan's due process rights

---

[9] Chan argues that the Court of Appeal "at no time acknowledged [the] principle that 'any evidence deserving of any consideration whatever' suffced to warrant the instruction, all contrary to controlling federal constitutional law."  Petition at 24 (quoting *People v. Eid*, 187 Cal. App. 4th 859, 879 (2010)).  However, the standard Chan cites from *Eid* is no different than the standard employed by the Court of Appeal in this case.  In *Eid*, the court's inquiry focused on whether jury instructions "were supported by *sufficient evidence*," a term it used interchangeably with "substantial evidence."  *Eid*, 187 Cal. App. 4th at 880-81 (emphasis added).  Here, as in *Eid*, the Court of Appeal evaluated the evidence to determine whether substantial evidence existed to warrant an instruction.  *Chan*, at *6.

United States District Court
Northern District of California

1    and Chan's petition must be denied.  *See, e.g., Terhune*, 422 F.3d at 1029 (because the habeas

2    court agreed with the state court's ruling that the evidence did not warrant a particular jury

3    instruction, "there was no error and thus . . . Petitioners' due process rights were not violated").

4    **I.      SUBJECTIVE PRONG**

5              In order to satisfy the subjective component of the *Mayberry* instruction, Chan was

6    required to present substantial evidence that he honestly and in good faith, albeit mistakenly,

7    believed that Yukari consented to sexual intercourse.  *Williams*, 4 Cal. 4th at 360-61.  To do so,

8    Chan was required to present substantial evidence of Yukari's "equivocal conduct on the basis of

9    which he erroneously believed there was consent."  *Id.*

10             The Court of Appeal found that there was not substantial evidence satisfying the subjective

11   component.  It stated:

12               As for the subjective element, there was no direct evidence of defendant's state of
                 mind because he did not take the stand and explain what he believed when he had
13               sex with Y.D.   Here, as in *Maury* [citation] "defendant offered no evidence
                 showing he believed that [the victim] had consented to sexual intercourse .... He
14               presented neither circumstantial evidence of his state of mind at the time of the
                 offense nor evidence that controverted the victim's testimony regarding the
15               circumstances of the offense." Defendant cites his denials in the pretext calls that
                 he had raped Y.D. as circumstantial evidence of his mental state during their
16               encounter, but those denials did not reveal whether any sexual activity took place,
                 much less anything about defendant's state of mind during such activity. The
17               inference defendant seeks to draw from those denials-that he reasonably, but
                 mistakenly believed that Y.D. consented to have sex-is entirely speculative, and
18               "speculation is not evidence" [citation]. Defendant's offer to drive Y.D. home after
                 the incidents is likewise less than substantial evidence of his state of mind when the
19               incidents transpired.  He might have offered Y.D. a ride because he reasonably, but
                 mistakenly believed that their sex had been consensual, or because he felt guilty
20               about what he had done, or because it was raining, or because he had to run an
                 errand, or for some other reason. The offer thus sheds no significant light on what
21               defendant may have believed about the encounter. One possible inference among
                 many that would be equally reasonable is, again, essentially speculative.
22
     *Chan*, at *10-11.
23
               The court began its analysis by noting that there was no direct evidence of Chan's state of
24
     mind at the time of the incident because Chan did not testify.  *Chan*, at *11.  Chan argues that the
25
     Court of Appeal's "reliance on his exercise of his Fifth Amendment right not to testify is yet
26
     another reason that its decision to affirm is constitutionally offensive."  Petition at 32.  But the
27
     Court of Appeal did not "rely" on the lack of testimony from Chan, it merely noted what evidence
28

was and was not available.  Given that the subjective prong requires evidence of Yukari's "equivocal conduct on the basis of which [Chan] erroneously believed there was consent," *Williams*, 4 Cal. 4th at 361, it was relevant for the court to observe that there was no direct evidence of Chan's subjective state of mind because he did not testify.  The court went on to evaluate Yukari's testimony.  Earlier in the opinion, it noted that "[e]vidence of equivocal conduct that would justify the instruction may be supplied by the victim's testimony alone."  *Chan*, at *9 (citing *People v. Castillo*, 193 Cal.App.3d 119, 126 (1987)).  But the court found that Chan did not present any evidence that controverted Yukari's testimony of her non-equivocal lack of consent.  *Chan*, at *11.  Having explained why Chan did not present substantial evidence of Yukari's equivocal conduct, the court went on to address Chan's specific arguments regarding the pretext call and his offer to give her a ride home.

Chan contends that his statements in the pretext call denying that he raped Yakuri and his offer to drive her home after the incident "evinced his belief that the alleged victim had consented to his sexual advances."  Petition at 27.  He argues that it was unreasonable for the Court of Appeal to "not consider both the statements and conduct together and ask whether, in conjunction, they provided the requisite sufficient evidence of petitioner's subjective beliefs."  *Id.*  Contrary to his argument, the Court of Appeal stated that neither the statements nor the offer to drive Yakuri home provided substantial evidence of, or "shed significant light" on, his state of mind during the incident, and that the inferences he sought to draw were speculative.  Given the court's wholesale rejection of Chan's proffered evidence because it was speculative, it was unnecessary and not unreasonable for the Court not to state explicitly that it also rejected the proffered speculative evidence in conjunction with each other.

Chan also contends that the Court of Appeal unreasonably rejected "as impermissible speculation the inference of [Chan's] subjective belief in Yukari's consent from the ride offer, even though such inference was admittedly reasonable."  Petition at 27.  Chan mischaracterizes the Court of Appeal's opinion.  The court did not state that it was reasonable to infer from the offered ride that Chan believed that Yakuri consented.  On the contrary, the court stated that the offer gave rise to any number of inferences, including that "he felt guilty about what he had done, or because

it was raining, or because he had to run an errand, *or for some other reason*"—and that any of those inferences would be "equally reasonable" with the inference he sought to draw.  *Chan*, at *6. Having concluded that the offer did not shed light on Chan's state of mind during the incident and did not weigh in favor of any particular inference, it was not unreasonable for the court to reject Chan's preferred inference as speculative.

Chan contends that it was unreasonable for the court to determine that the inferences he sought to draw from the ride and the denials in the pretext call were speculative.  *See* Traverse at 14 ("But why is it speculative to infer from a denial of rape by the accused an inference that he does not believe that he acted without consent?  Why is it speculation to infer that an accused who offered to drive the alleged victim home did not believe that he had just sexually assaulted her against her will?").  Keeping in mind the limits of AEDPA, I cannot conclude that it was unreasonable for the Court of Appeal to determine that Chan's denials *after the fact* and his offer to drive Yakuri home *after the incident* were merely speculative of his good faith belief in her consent *at the time of the incident.*

Chan contends that the Court of Appeal introduced an objective inquiry into its discussion of the subjective prong when it concluded that the inference Chan sought to draw from his denials in the pretext call, "that he *reasonably*, but mistakenly" believed that Yakuri consented, was speculative.  Petition at 28.  Chan argues that, as a result, "the court confused its analysis and conflated the two inquiries it was purportedly conducting—whether substantial evidence supported each prong of the *Mayberry* defense—into one."  However, the Court of Appeal explicitly, and in detail, conducted separate subjective and objective prong inquiries.  In its subjective prong inquiry, the court repeatedly noted the lack of substantial evidence of Chan's "state of mind" or what he "believed," without inquiring into the reasonableness of that belief. *Chan*, at *11 ("there was no direct evidence of defendant's *state of mind* . . . . he presented neither circumstantial evidence of his *state of mind* at the time of the offense . . . . those denials did not reveal whether any sexual activity took place, much less anything about defendant's *state of mind* during such activity . . . . Defendant's offer to drive Y.D. home after the incidents is likewise less than substantial evidence of his *state of mind* when the incidents transpired . . . . The offer thus

1    sheds no significant light on what defendant *may have believed* about the encounter"). The court

2    appropriately considered the subjective and prong inquiries separately and did not import an

3    objective component into the subjective prong.

4    **II.    OBJECTIVE PRONG**

5    In order to satisfy the objective component, Chan was required to present substantial

6    evidence that his mistaken belief of Yakura's consent was reasonable under the circumstances.

7    *Williams*, 4 Cal. 4th at 361. This required evidence of Yakuri's equivocal conduct that led Chan

8    "to reasonably believe there was consent." *Id.* (citing *People v. Bruce*, 208 Cal.App.3d 1099,

9    1104 (1989)); *see also Chan*, at *12 (*Mayberry* instruction is proper where there is "substantial

10   evidence of equivocal conduct that could be reasonably and in good faith relied on to form a

11   mistaken belief of consent").

12   The Court of Appeal stated that:

13   As for the objective element, the various bits of evidence defendant cites do not
     alone or in combination constitute substantial evidence of equivocal conduct on the
14   part of Y.D. that would support a *Mayberry* instruction. The first five events, which
     consisted of Y.D.'s e-mailing defendant, meeting him socially, accepting rides
15   from him, and agreeing to be shown around his house after resisting his first
     advance, could not create any reasonable belief that she wanted to have sex with
16   him. This conclusion follows from the discussion in *Williams,* where the victim
     among other things accompanied the defendant to a hotel room and no equivocal
17   conduct was found. [citation] "The relevant inquiry under *Mayberry* . . . is whether
     [the defendant] believed [the victim] consented to have intercourse, not whether she
18   consented to spend time with him. To characterize the latter circumstance alone as
     a basis for a reasonable and good faith but mistaken belief in consent to intercourse
19   is ... to 'revive the obsolete and repugnant idea that a woman loses her right to
     refuse sexual consent if she accompanies a man alone to a private place.'" [citation]
20
     Defendant notes that the results of Y.D.'s SART examination were consistent with
21   consensual sexual activity, but that physical evidence did not prove any equivocal
     conduct on Y.D.'s part and did nothing to illuminate defendant's mental state when
22   the sex occurred. Defendant cites evidence that Y.D. may have wiped his penis
     with a tissue after the sex was over, but only equivocal acts preceding or during the
23   sexual activity bore on any belief he might have formed about her consent to that
     activity while he engaged in it.
24
     Y.D. acknowledged removing her pants in defendant's bedroom, and letting herself
25   be led to and from the bathroom during their sexual activity, but said that those
     potentially equivocal acts followed defendant's use of threats and force that made
26   her believe resistance would be futile. *Williams*, [citations], anticipated such a
     scenario, as follows: "No doubt it would offend modern sensibilities to allow a
27   defendant to assert a claim of reasonable and good faith but mistaken belief in
     consent based on the victim's behavior *after* the defendant had exercised or
28   threatened 'force, violence, duress, menace, or fear of immediate and unlawful

United States District Court
Northern District of California

bodily injury ... ' [Citations.] However, a trier of fact is permitted to credit some portions of a witness's testimony, and not credit others. Since a trial judge cannot predict which evidence the jury will find credible, he or she must give the *Mayberry* instruction whenever there is substantial evidence of equivocal conduct that could be reasonably and in good faith relied on to form a mistaken belief of consent, despite the alleged temporal context in which that equivocal conduct occurred.  The jury should, however, be further instructed, if appropriate, that a reasonable mistake of fact may not be found if the jury finds that such equivocal conduct on the part of the victim was the product of 'force, violence, duress, menace, or fear of immediate and unlawful bodily injury ... .'" (Original italics.)

Thus, defendant is correct that the coercion Y.D. said he used may not necessarily negate a *Mayberry* defense. However, defendant's argument regarding equivocal conduct overlooks Y.D.'s testimony that she was sobbing while that conduct occurred, a fact that would have precluded any reasonable belief that the conduct demonstrated consent. Defendant puts special emphasis on Y.D.'s admission that she may have used language he did not understand when she told him before taking off her pants that she was not consenting, but, here again, he fails to acknowledge that she was crying at the time. Defendant simply lifts the words we have placed in italics from the following exchange: "Q. Had you already told the defendant at that point that you did not want to have sex with him?" "A. I had been crying a long time before that and *I said I really don't want to do it and I said I want to go home, so I thought he knew it. Even though he may not have understood my-the language,* normally if a crying woman, you would think a crying woman wouldn't want to do that right. Right?"  Thus, taking evidence out of its "temporal context" as permitted by *Williams,* [citation], does not assist defendant because Y.D. never testified to any conduct at any given time that could have created a reasonable impression that she consented to have sex with him. Substantial evidence to support a *Mayberry* instruction is lacking.

Even if we grant that the jury might not have credited Y.D.'s testimony that she was crying when she took off her pants and let herself be led around the house, no *Mayberry* instruction was required for the following reason. If the jury did not believe Y.D. when she said that defendant made threats and used force before they had sex, or that she was crying when the sex occurred, then what she described was an entirely consensual encounter, free of conduct that would have been subject to reasonable misinterpretation. [citations].

*Chan*, * 7-8.

Chan contends that the Court of Appeal unreasonably considered and rejected evidence that Yukari consented to spend time with him before the incident in isolation, rather than considering that evidence "as part of the constellation of facts that supported the reasonableness prong of petitioner's denied defense."  Petition at 32.  But the Court of Appeal explicitly stated that "the various bits of evidence defendant cites do not alone *or in combination* constitute substantial evidence of equivocal conduct on the part of [Yakuri] that would support a *Mayberry* instruction."  *Chan*, at *11 (emphasis added).  Chan's argument that the court refused to consider the evidence "in connection with the other evidence," Petition at 33, is contradicted by the record.

17

The Court of Appeal determined that "[i]f the jury did not believe [Yakuri] when she said that defendant made threats and used force before they had sex, or that she was crying when the sex occurred, then what she described was an entirely consensual encounter, free of conduct that would have been subject to reasonable misinterpretation." *Chan*, at *13. Chan argues that this determination was unreasonable because "[t]he jury could have disbelieved the force/crying testimony, or found the force used no greater than in consensual sex, but also concluded that (1) while Yukari did not want to engage in sexual activity, (2) she was unable to articulate her non-consent, or had done so in language that petitioner did not understand. Petition at 33. But rape under Penal Code Section 261(a)(2), the section under which Chan was convicted, is sexual intercourse "accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." *Chan,* at *1; Cal. Penal Code § 261(a)(2). Chan's theory of what the jury could have found if it disbelieved Yukari's testimony of her crying and Chan's use of threats and force does not match the definition of forcible rape in Section 261(a)(2). It was not unreasonable for the court to determine that if the jury disbelieved Yakuri's testimony of her crying and Chan's use of threats or force, then her remaining testimony described a consensual encounter and the *Mayberry* instruction would not have been appropriate.[10] *See, e.g., People v. Burnett*, 9 Cal. App. 4th 685, 690 (1992) ("If the defense evidence is unequivocal consent and the prosecution's evidence is of nonconsensual forcible sex, the instruction should not be given.").

Chan also argues that the state court ignored Yakuri's language difficulties when it determined that there was no middle ground from which Chan could argue equivocal conduct.[11] But Chan ignores the Court of Appeal's determination that Yakuri "never testified to any conduct

---

[10] As *Williams* explained, where the prosecution presents evidence of non-consensual sexual activity and the defense introduces evidence of consensual activity, there is no middle ground from which a defendant can argue equivocal conduct and the *Mayberry* instruction should not be given. *Williams*, 4 Cal. 4th at 362. In other words, a defendant is not entitled to a *Mayberry* instruction if he claims that sexual activity was consensual.

[11] Yakuri testified: "Even though he may not have understood my-the language, normally if a crying woman, you would think a crying woman wouldn't want to do that right. Right?" *Chan*, at *13.

United States District Court
Northern District of California

1    at any given time that could have created a reasonable impression that she consented to have sex

2    with him." *Chan*, at *8.  Accordingly, even if Chan did not understand Yakuri's verbal

3    expressions of lack of consent, her testimony still did not provide any evidence (much less

4    substantial evidence) satisfying the objective prong.  The court was therefore not unreasonable in

5    determining that Chan had not presented substantial evidence of equivocal conduct by Yakuri

6    leading Chan to reasonably believe there was consent.

7            The Court of Appeal rejected evidence that Yakuri "may have wiped his penis with a tissue

8    after the sex was over" on the grounds that "only equivocal acts preceding or during the sexual

9    activity bore on any belief he might have formed about her consent to that activity while he

10   engaged in it." Chan, at 12.  Chan argues that this was error, citing *People v. Castillo*, 193 Cal.

11   App. 3d 119 (1987), in support.  Petition at 35.  *Castillo* held that the trial court erred in failing to

12   give a *Mayberry* instruction because the victim's "testimony alone demonstrated equivocal

13   conduct which could have led defendant to believe that consent existed where in fact there was

14   none." *Castillo*, 193 Cal. App. 3d at 126.  Chan argues that the only equivocal conduct that the

15   victim testified to in *Castillo* occurred after the sexual activity."  Petition at 35 (emphasis in

16   original).  That is not so. The victim testified to events before and after the alleged rape, *Castillo*,

17   193 Cal. App. 3d at 121-22, and the court did not state which portion of the victim's testimony it

18   found relevant to the *Mayberry* issue.  There are also substantial differences that distinguish the

19   victim's conduct in *Castillo* and Yukari's in this case.  In any event, *Castillo* did not state a rule

20   that it is necessarily error, much less unreasonable, for a court to disregard conduct after the sexual

21   activity for purposes of determining a defendant's reasonable belief in consent at the time of the

22   activity.[12]  In light of Chan's violent actions and threats and Yukari's crying, I cannot conclude

23   that it was unreasonable for the Court of Appeal to determine that evidence that Yakuri may have

24   wiped Chan's penis with a tissue after the sexual activity did not bear on any belief Chan "might

25   have formed about her consent to that activity while he engaged in it."  *Chan*, at *7.

26   _____

27   [12] I am aware of no case that has interpreted *Castillo*, which was published in 1987, as standing for
     that proposition.  Chan does not cite any.  The *Castillo* court was not squarely presented with that
28   question, and I do not infer such a rule from *Castillo*'s reasoning.

United States District Court
Northern District of California

1    Finally, Chan argues that the Court of Appeal "had no basis for its outright rejection of the

2    evidence of Yukari's non-resistance (e.g., going up to petitioner's bedroom following his amorous

3    advances, undressing herself there) as irrelevant to the substantial-evidence question." Petition at

4    36. But the Court of Appeal did not determine that the evidence was irrelevant. Instead, it found

5    that it was not substantial evidence of equivocal conduct. *See Chan*, at *11-13. As the Court of

6    Appeal found, Yukari testified that "those potentially equivocal acts followed defendant's use of

7    threats and force that made her believe resistance would be futile." *Id*. at *12. Absent the court's

8    unreasonable application of those facts to the relevant law, Chan's disagreement with the court's

9    interpretation of the facts does not entitle him to habeas relief.

**CONCLUSION**

11    For the reasons above, the state court's determination that the evidence presented at trial

12    did not entitle Chan to the *Mayberry* instruction was not contrary to, and did not involve an

13    unreasonable application of, federal law, nor was it based on an unreasonable determination of the

14    facts. Chan's petition is DENIED.[13]

15    A certificate of appealability will not issue. Reasonable jurists would not "find the district

16    court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S.

17    473, 484 (2000).

18    **IT IS SO ORDERED**.

19    Dated: June 6, 2014

20    _____

21    WILLIAM H. ORRICK
     United States District Judge

22

23

24

25

26

27

28    _____
[13] Because I find that Chan has not met his burden under AEDPA, I do not address whether the
failure to provide the *Mayberry* instruction was prejudicial.